1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   U-Haul International, Inc., et al,              )      No. CV 04-0662 PHX-DGC
                                                   )
10              Plaintiffs,                         )
                                                   )      **ORDER**
11  vs.                                            )
                                                   )
12  Lumbermens Mutual Casualty Company,)
                                                   )
13              Defendant/Counter-Claimant.)
                                                   )
14  _____)
                                                   )
15  Lumbermens Mutual Casualty Company,)
                                                   )
16              Defendant/Counter-Claimant,)
                                                   )
17  vs.                                            )
                                                   )
18  U-Haul International, Inc., et al,              )
                                                   )
19              Counter-Defendants.                )
                                                   )
20  _____)

21          Pending before the Court are Plaintiffs' motion for summary judgment and

22  Defendant/Counter-Claimant's motion for summary judgment.  Docs. ##110, 111.  For the

23  reasons set forth below, the Court will grant in part and deny in part Plaintiffs' motion.  The

24  Court will also deny in part Defendant/Counter-Claimant's motion.[1]

25

26  _____

    [1] The Court will deny the request for oral argument because the parties have submitted
27  memoranda thoroughly discussing the law and evidence and the Court concludes that oral
    argument will not aid its decisional process.  *See Mahon v. Credit Bur. of Placer County,*
28  *Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999).

1 **I.      Background.**

2      **A.      U-Haul's Coverage Scheme.**

3      Plaintiffs U-Haul International, Inc., U-Haul Company of Pennsylvania, and U-Haul

4 Company of Florida (collectively, "U-Haul") intended to be covered by a comprehensive

5 insurance scheme consisting of separate, individual insurance policies, or "layers".  Doc.

6 #110; *see Employers Ins. Co. of Wausau v. Century Indem. Co.*, 443 F.3d 573, 574 n.1 (7th

7 Cir. 2006) (explaining the concept of layered coverage); *AMHS Ins. Co. v. Mut. Ins. Co. of*

8 *Ariz.*, 258 F.3d 1090, 1093 (9th Cir. 2001) (same); *Am. Family Mut. Ins. Co. v. Cont'l Cas.*

9 *Co.*, 23 P.3d 664, 666 (Ariz. App. Div. 1 2001) (same).

10      During the relevant coverage periods – April 1, 1999 to March 31, 2000, and April

11 1, 2000 to March 31, 2001 – U-Haul was protected by four layers.[2]  Docs. ##110, 111; *see*

12 Doc. #110, App. A.  The first three policies, issued by Plaintiff Republic Western Insurance

13 Company ("Republic Western"), provided primary and excess coverage up to a total limit

14 of $7,000,000 per occurrence in excess of a $25,000 self-insured retention ("SIR").  The

15 fourth policy, purchased from Defendant Lumbermens Mutual Casualty Company ("LMC"),

16 provided excess coverage up to a limit of $13,000,000 per occurrence.  In other words, the

17 LMC policy did not attach until the $25,000 SIR and the $7,000,000 total coverage provided

18 by the underlying Republic Western policies were exhausted.

19

20 _____

21 [2]From April 1, 1999 to March 31, 2000, Policy No. RG99 ("RG99") provided primary
coverage in excess of a self-insured retention of $25,000, up to a limit of $250,000 per

22 occurrence. The second, Policy No. RX99 ("RX99"), provided excess coverage up to a limit
of $750,000 per occurrence.   The third, Policy No. RU99 ("RU99"), provided excess

23 coverage up to a limit of $6,000,000 per occurrence. The fourth, Lumbermens Policy No.
9SR 120037-01 ("LMC99"), provided excess coverage up to a limit of $13,000,000 per

24 occurrence. From April 1, 2000 to March 31, 2001, U-Haul's coverage scheme consisted of
four almost identical policies. Republic Western Policy No. RGMM replaced RG99,

25 Republic Western Policy No. RXMM ("RXMM") replaced RX99, Republic Western Policy

26 No. RUXX ("RUMM") replaced RU99, and Lumbermens Policy No. 9SR 120037-02
replaced LMC99. For our purposes, the only noteworthy differences between the 1999-2000

27 and 2000-2001 policies are:  the per occurrence limit for RXMM increased to $1,750,000,

28 and the per occurrence limit for RUMM decreased to $5,000,000.

1     **B.     U-Haul's Settlements.**

2          On or about September 22, 2002, U-Haul settled the "Nelson claim," which arose out

3    of an automobile accident that occurred on May 31, 1999, for the sum of $7,500,000.

4    Compl.   U-Haul also settled the "Fernandez claim," which arose out of an automobile

5    accident that occurred on May 10, 2000, for $8,000,000.  As the settlement amounts were

6    above the $7,000,000 coverage limit of the Republic Western policies, all four layers of U-

7    Haul's coverage were implicated.

8          **C.     The Parties' Dispute.**

9          U-Haul and LMC disagree on whether the payment of indemnity and loss adjustment

10   expenses ("LAE") – generally, legal fees incurred in the investigation, negotiation, or

11   defense of a claim – or the payment of indemnity alone (1) exhausts the $7,000,000 total

12   limit of the Republic Western policies and (2) may trigger the coverage of the LMC policy.

13   *See* Doc. #110 at 1 ("The gravamen of this litigation is whether allocated loss adjustment

14   expenses . . . are included in and reduce the limits of liability available to pay claims under

15   [Republic Western's] underlying policies.")

16         U-Haul and Republic Western (collectively, "Plaintiffs") contend that payments of

17   both indemnity and LAE are included in a determination of whether the $7,000,000 limit has

18   been reached, and that "LMC's coverage applies excess of the underlying [Republic

19   Western] policies' $7 million in combined limits of liability with respect to an occurrence,

20   regardless of whether those occurrence limits have been reduced or eroded by indemnity

21   payments or by LAE payments" or both.  Doc. #110 at 1-2.  LMC argues that the $7,000,000

22   limit is reached by payments of indemnity alone, and that LMC's coverage "does not attach

23   until a total of $7,000,000 in indemnity payments has been paid" by the underlying Republic

24   Western policies.  Doc. #91 at 50.

25         As a result of the parties' competing views as to the exhaustion point of the Republic

26   Western policies and the attachment point of the LMC policy, Plaintiffs filed suit against

27   LMC, asserting a breach of contract claim and seeking two declaratory judgments.  Compl.

28   LMC removed the case pursuant to 28 U.S.C. § 1441(a) on the basis of diversity jurisdiction.

1   LMC also filed a counter-claim against U-Haul, Republic Western, and others,[3] seeking

2   reimbursement for amounts it allegedly overpaid on the Nelson and Fernandez claims.  Doc.

3   #91.

4        Before the Court are Plaintiffs' and LMC's motions for summary judgment.  Docs.

5   ##110, 111.  The parties ask the Court to clarify their responsibilities under the policies and

6   seek appropriate relief with respect to their contributions to and handling of the Nelson and

7   Fernandez claims.  The Court will address the parties' contractual obligations and any relief

8   available to the parties given these obligations.

9   **II.   Summary Judgment Standard.**

10       Summary judgment is appropriate if the evidence, viewed in the light most favorable

11  to the nonmoving party, "show[s] that there is no genuine issue as to any material fact and

12  that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see*

13  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Only disputes over facts that might

14  affect the outcome of the suit . . . will properly preclude the entry of summary judgment."

15  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The disputed evidence must be

16  "such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. at 248.

17  Summary judgment may be entered against a party who "fails to make a showing sufficient

18  to establish the existence of an element essential to that party's case, and on which that party

19  will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

20  **III.  Discussion.**

21       **A.   Contractual Obligations.**

22       The parties appear to agree that, for the first two layers of coverage (i.e., Republic

23

24  [3]AMERCO; AMERCO Real Estate Company d/b/a/ Novi Manufacturing Company and
25  Warrnington Manufacturing Company; AMERCO Real Estate Services, Inc.; AMERCO
    Real Estate Company of Texas, Inc.; U-Haul Business Consultants, Inc.; U-Haul Company
26  of Arizona; U-Haul Company of California d/b/a/ Paramount Manufacturing Co.; U-Haul
    Company of Indiana, Inc. d/b/a/ Chicago Assembly Division; U-Haul Company of
27  Massachusetts, Inc. d/b/a/ Boston Trailer Manufacturing Company, Inc.; U-Haul Company
28  of Michigan; and U-Haul Company of Texas d/b/a/ DFW Manufacturing Company, Inc.

1   Western's primary and subsequent excess policies), LAE are included in a determination of

2   whether the policy limits have been exhausted.  *See* Doc. #111 at 4 ("Republic Western's

3   first two policies . . . are defense within limits.") They disagree, however, as to whether the

4   coverage limit of the third Republic Western policy (hereinafter referred to as the "RU

5   policy"[4]) includes LAE.  *See id.* at 2 ("The dispute between Republic Western and LMC

6   centers on the issue of whether Republic Western's third layer of coverage . . . is reduced by

7   Republic Western's payment of defense costs and whether the [third layer of coverage] and

8   the LMC policies drop down to apply at a lower level due to defense costs eroding the limits

9   of Republic Western's first two layers of coverage[.]")

10              **1.      "Incurred by the Insured."**

11          The Court will first examine the text of the RU policy.  *Cf. PMI Mortg. Ins. Co. v. Am.*

12  *Intern. Specialty Lines*, 394 F.3d 761, 764 (9th Cir. 2005) ("the lodestar of our analysis must

13  be the mutual intent of the parties as expressed in the provisions of the insurance policy

14  itself.")  The policy obligates Republic Western to pay the "ultimate net loss" in excess of

15  the underlying policies (i.e., the first two Republic Western policies).  Doc. #110 at 5.

16  "Ultimate net loss" is defined in the policy as:

17          (1) All sums which the insured or any carrier as its insurer or both become
            legally obligated to pay as damages, whether by reason of adjudication or
18          settlement, because of personal injury . . . to which this policy applies and
            (2) All expenses incurred by the insured in the investigation, negotiation,
19          settlement and defense of any claim or seeking such damages excluding only
            the salaries of the insured's regular employees, provided Ultimate Net Loss
20          shall not include any damage or expense because of liability excluded by this
            policy (including endorsements forming a part thereof).
21
    *Id* (emphasis omitted).
22
            LMC argues that the phrase "expenses incurred by insured" refers only to expenses
23
    paid by U-Haul, not Republic Western, and states that "the only defense costs that are the
24
    subject of this litigation are defense costs paid by Republic Western."  Doc. #122 at 9.
25
    Accordingly, LMC claims that the defense costs paid by Republic Western are not an
26

27
    ───────────────────
28  [4]The policies are RU99 during the April 1, 1999 to March 31, 2000 coverage period, and
    RUMM during the April 1, 2000 to March 31, 2001 coverage period.

1   "ultimate net loss" and thus not an amount that counts towards the RU policy's limits.  *Id.*

2          Plaintiffs argue that the definition of an "ultimate net loss" includes defense costs

3   "incurred by an insured but paid by the insurer pursuant to its contractual obligations, as the

4   insurer would ultimately pay in any event."  Doc. #121 at 2 (emphases omitted).  The Court

5   agrees.  In Arizona, the law of which applies in this diversity action (Doc #111), "'Incur' is

6   generally accepted to mean 'to become liable for', not 'to pay for.'" *Coconino County v.*

7   *Fund Administrators Ass'n, Inc.*, 719 P.2d 693, 696 (Ariz.App.1986) (citations omitted); *cf.*

8   *In re Pacific-Atlantic Trading Co.*, 64 F.3d 1292, 1298 (9th Cir. 1995) ("According to its

9   common usage, 'incur' means to 'become liable or subject to.'") (citation omitted).  In this

10  case, the liability being defended against was U-Haul's.  The defense costs were undertaken

11  in U-Haul's defense.  The Court accordingly concludes that the defense costs ultimately were

12  the liability of U-Haul, and therefore were "incurred" by U-Haul notwithstanding the fact

13  that they were actually paid by U-Haul's insurer.  Defendant does not appear to dispute that

14  the defense costs, while paid by Republic Western, were U-Haul's liability.  *See* Docs. ##

15  117, 121.

16                    **2.      Relevance of *Mead* and *Planet*.**

17         Defendant argues that defense costs, even if paid by Republic Western, are not an

18  "ultimate net loss" in light of *Mead Reinsurance v. Granite State Ins. Co.*, 873 F.2d 1185 (9th

19  Cir. 1998) and *Planet Ins. Co. v. Mead Reinsurance Corp.*, 789 F.2d 668 (9th Cir. 1986).  In

20  these cases, the Ninth Circuit held that "ultimate net loss," as defined by the reviewed

21  policies, did not include legal fees and costs.  *E.g., Mead*, 873 F.2d at 1187.  Defendant urges

22  the Court to reach the same conclusion with respect to the RU policy.

23         The policies in *Mead* and *Planet* are identical and contained the following definition

24  of an "ultimate net loss":

25         (1) The sum actually paid . . .  in the settlement or satisfaction of losses for
           which the insured is liable . . . with the written consent of the "Company,"
26         after making proper deductions for all recoveries and salvages collectible, (2)
           and includes attorney's fees, court costs and interest on any judgment or
27         award, (3) but excludes all loss adjustment, expenses and all salaries of
           employees and office expenses of the insured[.]
28

1   *Id*. at 1187-88.  This definition of "ultimate net loss" explicitly excludes loss adjustment

2   expenses.  The RU policy's definition of an "ultimate net loss" contains no such exclusion

3   and specifically includes a broad definition of covered defense expenditures:  "expenses

4   incurred . . . in the investigation, negotiation, settlement and defense of any claim[.]"  Doc.

5   #110 at 5.

6          LMC contends, nevertheless, that the policy in *Mead/Planet* and the RU policy are

7   sufficiently analogous; in fact, LMC states that they are "identical."  Doc. #111 at 5.  LMC

8   argues in particular that the second clause of the *Mead* policy "describe[s] defense costs and

9   therefore corresponds" with the second clause of the RU policy.  *Id*.  The second clause of

10  the *Mead* policy, however, addresses defense costs that are part of a judgment or award.

11  *Mead*, 873 F.2d at 1188-9 ("the 'attorney fees' refer to plaintiff's attorney fees awarded by

12  the court.").  The second clause of the RU policy, by contrast, refers to "[a]ll expenses

13  incurred . . . in the investigation, negotiation, settlement and defense of any claim" without

14  regard to whether these expenses were awarded by a court or simply amassed in the course

15  of a lawsuit.  Doc. #110 at 5; *see also id.* at 12, n.6.

16         Although the Court disagrees that the policies in *Mead*, *Planet*, and the present action

17  are sufficiently similar to warrant the direct application of the Ninth Circuit's holdings from

18  those two cases, the Court acknowledges that the Ninth Circuit was concerned about the

19  consequences of interpreting "ultimate net loss" to include defense costs.  For example, the

20  Ninth Circuit identified a "conflict" between the clauses if it held that attorneys' fees,

21  regardless of whether they were awarded by a court or simply incurred, were covered, even

22  though LAE was explicitly excluded from "ultimate net loss."  Doc. #111 at 6.  Here, the two

23  clauses provide coverage to costs awarded by a court as well as to costs incurred in the

24  course of investigating or settling a lawsuit.  The Court does not find any inherent

25  inconsistency in the RU policy's definition of an "ultimate net loss," particularly because

26  LAE are expressly included in, rather than excluded from, the definition.

27         Nor does the inclusion of LAE present problems with respect to other provisions of

28  the RU policy.  In *Planet*, the Ninth Circuit noted that the "Defense, Settlement and

- 7 -

1   Supplementary Payments" section of the policy in question gave the impression that the

2   insurer was responsible for "contribut[ing] legal defense expenses" even though the policy's

3   definition of "ultimate net loss" "limit[s] the availability of defense funds." *Planet*, 789 F.2d

4   at 672. The RU policy, however, does not feature such limitations: there is no exclusion of

5   defense costs in the definition of an  "ultimate net loss." The Court does not find an

6   inconsistency – either in the definition of an "ultimate net loss"or in the policy as a whole

7   – in including LAE as an "ultimate net loss" in the RU policy. *See Planet*, 789 F.2d at 670

8   ("the policy must be read as a whole in order to give a reasonable and harmonious meaning

9   and effect to all its provisions") (citations omitted).

10                          **3.       Republic Western's Duty to Defend.**

11          LMC argues that even if the two clauses of the "ultimate net loss" definition include

12   LAE, the sentence following the clauses indicates that Republic Western's duty to defend is

13   non-exhaustible and non-delegable. Docs. #111, 121. The sentence reads: "This policy shall

14   not apply to defense, investigation, settlement or legal expenses covered by underlying

15   insurance." Doc. #110 at 5.

16          Plaintiffs argue that this sentence simply "states that the RU policies will not pay for

17   defense costs which have already been paid by the underlying . . . policies." Doc. #121 at

18   2-3 (emphasis omitted). The Court agrees. A plain reading of the policy suggests that this

19   provision avoids possible redundancy of payments by ensuring that the excess policy does

20   not provide payment for expenses covered by the underlying policies. *See Sparks v. Republic*

21   *Nat. Life Ins. Co.*, 647 P.2d 1127, 1132 (Ariz. 1982) (citation omitted) ("Provisions of

22   insurance policies are to be construed in a manner according to their plain and ordinary

23   meaning."). The purpose of excess policies involved in layered coverage schemes reinforces

24   our understanding of this provision. *See Fireman's Fund Ins. Co. v. Commerce & Indus. Ins.*

25   *Co.*, 2000 WL 1721080, at \*3 (N.D.Cal. 2000) ("Excess and primary insurers do not cover

26   the same 'risks' because an excess insurer intends only to cover the risk that a loss will

27   exceed the amount covered by the primary insurer.").

28

1

**4.      The Doctrine of Reasonable Expectations.**

2          LMC argues that to include LAE as part of "ultimate net loss" and the RU policy

3    limits would upset its "reasonable expectations under the reasonable expectations doctrine."

4    Doc. #111 at 7.  The Court disagrees. The doctrine of reasonable expectations is designed to

5    protect the insured, generally individual consumers without legal training or bargaining

6    power, from boilerplate language that did not conform to their reasonable expectations

7    regarding the coverage of the policy.  The doctrine is not a shield for sophisticated insurers.

8    *See Am. Family Mut. Ins. Co. v. White*, 65 P.3d 449, 456 (Ariz.App. Div. 1 2003) ("A court

9    may apply the reasonable expectations doctrine when a reasonably intelligent *consumer*

10   cannot understand the policy language; when an *insured* does not receive full and adequate

11   notice and the provision is unusual, unexpected, or emasculates apparent coverage; when

12   some activity reasonably attributable to the insurer would create an objective impression of

13   coverage in the mind of a reasonable *insured*; or when some activity reasonably attributable

14   to the insurer has induced an *insured* to reasonably believe that coverage exists, although the

15   policy clearly denies such coverage.") (emphases added).  It is also noteworthy that the LMC

16   policy followed the terms of the underlying Republic Western policies.  Doc. #110.

17

**5.      "Dropping down" of Policies.**

18         LMC contends that neither the RU policy nor the LMC policy "drop down" (Doc.

19   #111), that is, provide coverage at a point lower than the general attachment point due to the

20   inability of the underlying policy to provide such coverage.  *See Ehrlich v. State Farm Fire*

21   *and Cas. Co.*,  78 F.3d 592, 593 (9th Cir. 1996).  Plaintiffs argue that LMC inappropriately

22   "frames the issue here in dispute as whether the RU and LMC policies 'drop down' due to

23   [Republic Western's] payment of defense costs on behalf of U-Haul."  Doc. #121 at 12.

24         LMC apparently confuses "dropping down" (the excess insurer covering an amount

25   lower than the normal attachment point) with what may properly trigger the attachment point

26   of excess policies (whether indemnity and LAE may exhaust an underlying policy and trigger

27   the normal attachment point).  In particular, LMC appears to consider "dropping down" to

28   occur when the underlying policy is exhausted by payment of indemnity and LAE, and the

- 9 -

1    excess policy begins coverage where the indemnity payments left off.

2           LMC admits, however, that the first two underlying policies are defense within limits,

3    that is, the exhaustion point for the policies may be met by payment of both indemnity and

4    LAE. *See* Doc. #111.  If the underlying policies are exhausted, no "dropping down" of the

5    RU policy is implicated – coverage will spill over to the RU policy only after satisfaction of

6    the underlying policy limits.  Similarly, from the analysis above, the Court concludes that

7    LAE are covered in the RU policy's definition of an "ultimate net loss."  Thus, the RU policy

8    may be exhausted by payments of indemnity and LAE, and the LMC policy attaches after

9    said exhaustion.

10           LMC cites *Maricopa County v. Fed. Ins. Co.*, 757 P.2d 112 (Ariz. App. 1988), in

11   which the court held that an excess carrier was not required to "drop down."  That case,

12   however, involved a primary insurer that was unable to provide coverage as a result of

13   insolvency; no exhaustion occurred.  Here, by contrast, exhaustion of the Republic Western

14   policies may occur by payment of indemnity and LAE.  *Maricopa* is inapposite.

15                    **6.     Conclusion.**

16           In light of the Court's analysis, including its construction of the policy terms and the

17   unsuitability of the reasonable expectations doctrine to the present action, the Court

18   concludes that the RU policy may be exhausted by payments of indemnity and LAE.  The

19   Court will grant Plaintiffs' motion for summary judgment with respect to the parties'

20   contractual obligations.

21           **B.     Relief.**

22           The Court is unable to determine from the record what, if any, relief is available to

23   Plaintiffs and Defendant.  The parties are therefore directed to meet and discuss the

24   settlement of the remaining claims in consideration of the Court's conclusions with respect

25   to the parties' contractual obligations.  The parties shall jointly file a report **(5 pages or less)**

26   within **30** days of the date of this order, which shall contain the following information in

27   separately numbered paragraphs:

28           1.     The status of the discussions, including whether the remaining claims have

1 | been settled; and

2 |      2.     If a settlement has not been reached:

3 |           a.     A short description of the legal and/or factual issues precluding an

4 | amicable  settlement from being achieved;

5 |           b.     A statement regarding whether a hearing or further, limited briefing

6 | would aid the Court and parties in resolving this case.

7 | It is the responsibility of the parties to cooperatively participate in settlement efforts and in

8 | preparing a joint status report for the Court.

9 |      **IT IS ORDERED**:

10 |      1.     Plaintiffs' motion for summary judgment, Doc. #110, is **granted in part and**

11 | **denied in part** as set forth by this order.

12 |      2.     Defendant's motion for summary judgment, Doc. #111, is **denied in part** as

13 | set forth by this order.

14 |      3.     The Court **directs** the parties to engage in settlement discussions and to file a

15 | joint status report as set forth by this order.

16 |      DATED this 12th day of June, 2006.

17

18

19 |                _____

20 |                David G. Campbell
               United States District Judge

21

22

23

24

25

26

27

28